Bloomfield Ranch et al. v. Commissioner.
Bloomfield Ranch v. Commissioner
Docket No. 5007.
United States Tax Court
1947 Tax Ct. Memo LEXIS 322; 6 T.C.M. (CCH) 84; T.C.M. (RIA) 47018; January 31, 1947
*322 Eustace Cullinan, Esq., and O. K. Cushing, Esq., 1 Montgomery St., San Francisco 4, Calif., for the petitioners. Leonard A. Marcussen, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Apartnership income tax return was filed for Bloomfield Ranch for the year 1940. The respondent has held that Bloomfield Ranch is an association as defined in section 3797(a)(3) of the Code, and that it is therefore taxable as a corporation. That determination has resulted in a deficiency in income tax and declared value excess profits tax for the year 1940 in the respective amounts of $6,646.60 and $4,159.58. The general question is whether Bloomfield Ranch is an association taxable as a corporation. The partnership return was filed with the collector for the first district of California. The record consists of stipulations of fact, testimony and exhibits. Findings of Fact The stipulations of fact are adopted as part of the findings of fact, and are incorporated herein by reference. The petition in this proceeding is filed under the name of Bloomfield Ranch by James A. Clayton & Co., and others, who describe themselves as partners and *323 co-owners of "Bloomfield Ranch." The issue relates to real estate, later referred to as Bloomfield, located in California, in the counties of Santa Clara, San Benito, and Santa Cruz, comprising 21 separate parcels of land, which were owned, originally, by a corporation named Miller & Lux, Inc. The 21 parcels of land contained 27,500 acres, which were suitable for various agricultural purposes, of which some parts were river bottoms, forest lands, swamp and overflowed lands, land in roads; and 42 acres were located in the city of Gilroy. The tracts were widely scattered; and the distance from north to south was about 14 miles; and, from east to west, about 13 miles. Miller & Lux had operated the properties as one going concern for raising cattle and feed, and for conducting some farming operations. Thousands of heads of cattle were handled, and as many as 200 men were employed, at times, to attend to the cattle. The properties above described were sold on March 10, 1926, under the following arrangements: The president of James A. Clayton & Co., hereinafter called Clayton Company, induced thirteen customers of the company to join with the company in the purchase of the above described *324 properties. Clayton Company, a California corporation, has been engaged in the business of real estate agent and broker since 1903. Clayton Company and thirteen individuals advanced $50,000, each, or a total of $700,000 cash. They formed what they called a "syndicate." The only "agreement" of the parties was represented by fourteen separate written instruments, identical in terms, which were signed by Clayton Company, designated as "Operator;" and each person who contributed to the fund of $700,000, designated as "Investor." The agreement, comprised of the fourteen separate instruments, acknowledged receipt of $50,000 by the Operator for the purposes and upon the terms stated. The purposes and terms set forth in the instruments of agreement, which are incorporated herein by reference, are briefly as follows: 1. The Operator, Clayton Company, was to use the entire fund contributed by the Investors, and other funds borrowed by the Operator, to purchase the several tracts of land, comprising about 27,000 acres, from Miller & Lux. Titles were to be held in the name of an employee of Clayton Company, M. E. Thomas. However, it was provided that titles could be held in the name of Clayton *325 Company, or of any person, corporation, or concern, and that the Operator could have titles conveyed to other persons, corporations, or concerns in trust for the fourteen Investors. The purpose was for "the profitable resale" of the lands. 2. The Operator was empowered to "sell, convey, hold, lease for one season only, or in any otherwise deal with and treat said properties as the sole and absolute owner thereof in fee simple, and without let or hindrance from the Investor, or any of the Investors, less than the full number thereof," but it could not "exchange, encumber, nor lease except as above specified, nor sell the trees, wood or improvements off from said property without the consent of the Investors." The Operator could incur costs and expenses in connection with "acquiring, holding, renting, selling or protecting of said properties" as it should deem proper. 3. The Operator was authorized to use the moneys received from "sales or renting or other sources of said properties," for the payment, first, of a commission of 5 percent to itself on the gross selling price of each parcel sold; and for the payment of all costs, expenses, and charges paid or incurred by the Operator *326 in the premises; and for the repayment of all moneys borrowed, together with interest. 4. Each Investor was entitled to have returned to him the $50,000 which he advanced, in whole or in part, in the Operator's judgment, but no Investor was entitled to receive repayment of his contribution before the properties had been converted into cash and all charges and expenses had been fully paid. When all the properties are sold and all debts paid, the Operator shall pay the net proceeds to the Investors, in equal shares to each of them, their heirs and assigns. It was provided that distributions could be made in equal amounts to each Investor whenever the Operator had a net amount, after payment of charges, of $7,000 or more on hand. 5. It was agreed that the Operator should receive a commission of $50.000 for negotiating and consummating the purchase of the properties from Miller & Lux, in addition to the 5 percent commissions on resales. 6. Each Investor is entitled to have an accounting rendered to him, but not oftener than once each 60 days. 7. The agreement of each Investor is binding upon his successors, heirs, representatives, and assigns. On March 10, 1926, Clayton Company *327 paid Miller & Lux $1,235,000 for the several parcels of land, which were known as "Bloomfield," and which are referred to hereinafter as Bloomfield, for convenience. Clayton Company borrowed $585,000, which with the $700,000 of the Investors made up $1,285,000, the purchase price plus the Operator's $50,000 commission. Titles were taken in the name of M. E. Thomas, an employee of Clayton Company; notes were signed by her; and deeds of trust were given to two concerns which loaned the borrowed money. When the lands were acquired from Miller & Lux, there were leases existing which had been made by Miller & Lux, and the land was taken over subject to the leases. They yielded rents of $34,041 in 1926. During a five-year period, 1926 to 1930, inclusive, 90 percent of the property, about 24,828 acres, were sold for the total sum of $1,452,326. The loans from Miller & Lux and the Bank were paid by the end of 1927. At the end of 1930, there remained 2,672 acres, unsold. The depression following the "crash" of October, 1929, depressed the real estate market, generally, and the sales of the property in question fell off after 1930. During ten years. from 1930 to 1940, inclusive, the only *328 sales were sales of 60 acres for rights of way for public services, and but for such sales, no sales would have been made in 1935, 1938, 1939, 1940, and 1942. From 1941 to 1944, 1,112 acres were sold for $541,843, most of the sales being made in 1944. At the end of 1944, 1,500 acres remained unsold. The 42 acres in the town of Gilroy were sold in parcels making up a city block. There was never any intention of subdividing this acreage into lots, and the Operator refused to sell land in units of less than one block. From the beginning, in 1926, Clayton Company adopted a policy of renting parcels of the acreage under leases to run for one year, subject to renewal for another year; and of keeping some of the acreage under cultivation in wheat or barley, until parcels were sold. When lands were sold, tenants were moved to other locations. The reasons for renting and cultivating the acreage, pending sales, were two-fold: To carry the taxes on the property and to keep the property from going "native," i.e., becoming over-grown with weeds and brush. The Operator paid himself a commission for renting lands. Income from farming and renting was accounted for separately on tax returns. Farming *329 operations were carried on at a loss except in 1930, 1931, and 1934. From 1926 through 1940, the operations of Clayton Company consisted of farming, renting, and selling property; collecting rents and payments of principal and interest on installment sales; paying taxes; disposing of produce raised on farms; and, in general, taking care of the financial and accounting aspects of the venture. During the 15-year period, 1926 through 1940, receipts of interest totalled $156,402.85; profits from sales totalled $311,766.93; gross receipts from rents totalled $456,062.91; and miscellaneous receipts totalled $19,533.97. The total of taxes for the same period was $224,722.76. Sales to and including 1940 totalled $1,474,243.06. Sales during 1941 to 1944, inclusive, totalled $352,600. The total gain over the cost of the properties, $1,285,000, aggregates $541,843.06. Distributions totalling $98,250 have been made to each holder of the fourteen units, totalling $1,375,500, which represents return of the original $700,000 capital plus profits from all operations. When all the acreage was purchased in 1926, Miller & Lux had put in nine wells and nine pumpting units for pumping water. *330 After 1931, when Clayton & Co., and some tenants, turned to truck farming, wet farming; and when dry years reduced the level of water in the ground, Clayton & Co. put in some wells and pumps, and made some repairs to existing wells and pumps, at a total cost of $37,903, of which sum $8,267 was spent on the Miller & Lux wells and pumps. There have not been any exchanges of the Bloomfield property, nor reinvestments in other property. Frazier O. Reed, president of Clayton Company, managed the operations. He discussed progress with the Investors when he saw them, individually. He called them all together to meet on three occasions to discuss income tax problems. There were originally fourteen Investors and each had a one-fourteenth interest in the venture. Since 1926, changes have occurred in the Investors' interest due to deaths, transfers, and sales of all or part of a one-fourteenth interest, so that there are now nineteen Investors holding the original fourteen interests, some holding less than a one-fourteenth's interest and some holding a complete one-fourteenth interest plus part of another one-fourteenth interest. Whenever any changes in interest were made, Clayton Company *331 was notified and made formal acknowledgment and record of the change in interests. The original agreement of each Investor had attached to it endorsement of any assignment or transfer of all or part of a one-fourteenth interest which showed how the transfer of interest came about or was made. The Bloomfield Ranch Syndicate is an association taxable as a corporation. Opinion The only question is whether Clayton Company and certain individuals constitute an association within the definition contained in section 3797 (a) of the Internal Revenue Code, so as to constitute a taxable entity, taxable as a corporation as respondent has determined. The taxable year is 1940. There are nineteen petitioners in this proceeding. Petitioner relies chiefly upon Commissioner v. Gerstle, 95 Fed. (2d) 587. The question must be decided upon the particular facts of this case. Upon careful examination of the evidence, it is concluded that those who made up a fund of $700,000 for the purchase of the Miller & Lux property constituted an association, and that respondent has correctly determined that there was an association taxable as a corporation. The question *332 is controlled by Morrissey v. Commissioner, 296 U.S. 344; Helvering v. Combs, 296 U.S. 365; Huron River Syndicate, 44 B.T.A. 859; Helm & Smith Syndicate v. Commissioner, 136 Fed. (2d) 440; Bing & Bing, Inc., 35 B.T.A. 1170; Kilgallon v. Commissioner, 96 Fed. (2d) 337; cert denied 305 U.S. 622. Petitioners contend that the Bloomfield venture was a liquidation operation. On this point, we are required by Morrissey v. Commissioner, supra, to look to the terms of the agreement of the parties and petitioners are not at liberty to say that they had a narrower or different purpose. Title Insurance & Trust Company v. Commissioner, 100 Fed. (2d) 482, 485. All of the parties agreed that about 27,000 acres of land were to be acquired and held for resale. The parties pooled their funds for the purpose of acquiring the property and reselling it at a profit. The purpose was stated to be "profitable resale." One member of the group was made the "Operator," or manager. It was given power to sell, convey, hold, and lease for one season, the properties, and to deal with the properties *333 as though it was the sole owner; and to incur expenses in connection with the acquiring, holding, renting, selling, or protecting the properties as it should deem proper. The acquisition of property for the express purpose of resale at a profit is a business undertaking. G. F. Sloan, et al., 24 B.T.A. 61; aff'd., 63 Fed. (2d) 666; Adelaide Park Land, 25 B.T.A. 211; Bing & Bing, Inc., supra. The acreage acquired was large and of varied character, most of it being raw country land suitable for ranching and farming, and 42 acres being city property. In good times, comparatively speaking, as the record shows, an operation of reselling such extensive holdings could not be carried out quickly, but would require several years. The record shows that it required five years to sell the major part of the property when the real estate market was good. While the petitioners contend that the original purpose was the immediate resale of the property, thus seeking to bring the question at issue, within the holding of the Gerstle case, the contention is not supported by the facts or the terms of the agreements. Such a large undertaking is not to *334 be compared to that which was involved in the Gerstle case. Furthermore, the purpose was stated in the agreements to be the "profitable resale" of the properties, (italics added), and there was no provision made about any time within which such purpose was to be carried out. Also, the agreements contemplated that the Operator could hold the property and could rent it for one-year terms during periods of holding. All that it was necessary to do constituted the conduct of a business for profit. It was necessary to negotiate many leases to rent portions of the land during the periods of holding; it was necessary to negotiate many sales and make many conveyances to resell the entire acreage; it was necessary to collect payments of principal and interest on installment sales contracts over periods of years. Clearly, the purpose was to make profits by dealing in real estate. We so conclude from the evidence. Clearly, the venture was not a mere liquidating undertaking. See Morrissey v. Commissioner, supra.See United States v. Rayburn, et al., 91 Fed. (2d) 162. In Morrissey v. Commissioner, supra, the Supreme Court stated that the distinguishing characteristic *335 of an "association" is that it is "created to enable the participants to carry on a business and divide gains which accrue from their common undertaking"; and that the term "association" implies associates entering into a joint enterprise for the transaction of business. We have here such association of persons for the transaction of business. Petitioners contend otherwise, arguing that each Investor, separately, was a principal, and Clayton Company was his agent. But we regard the argument as unsound. Although there was no single agreement, in form, each instrument contained identical terms and referred to the "thirteen other persons," the "Investors" who contributed "other sums"; and each instrument provided that Clayton Company was to use all of the sums contributed by all the Investors to purchase lands from Miller & Lux. Also, no Investor was entitled as a matter of right to receive any return or repayment of his contribution until all the properties were sold and all the debts paid; and all Investors were to share equally in the distributions whenever they were made. It must be concluded that the fourteen instruments constituted a single agreement. The undertaking was large; *336 it required $700,000 cash; it involved the purchase and resale of unusually large acreage of land. The venture was one which required associates. It was one, for example, that Clayton Company did not care to undertake alone. Under the name of "syndicate" Clayton Company, itself a member, brought into association thirteen others to enable all of the participants to carry on a venture of dealing in real estate and sharing the net profits accruing from the acquiring, holding, renting, and selling of the property. It is concluded that petitioners constituted an association. Morrissey v. Commissioner, supra.The facts show that the Bloomfield or Miller & Lux syndicate was substantially the same as the Carbarn Syndicate in Bing & Bing, Inc., supra. Petitioners contend that they were owners of undivided equitable interests in real property, who had appointed an agent to sell the property, and that while titles were taken in the name of M. E. Thomas, she was only a trustee of a resulting trust. Petitioners admit that there was no express trust. This argument is unsound and it is answered by the terms of the fourteen instruments constituting the agreement of the *337 parties. The instruments provided that titles to property were to be taken and held by the Operator in the name of M. E. Thomas, but that the Operator could have the titles conveyed to other persons, corporations or concerns, "or otherwise conveyed or held, as the Operator may desire, in trust for the said fourteen Investors.' Titles were originally taken and held by the Operator in the name of M. E. Thomas, and no change was ever made. The titles were not held by M. E. Thomas in trust. Furthermore, the fourteen Investors were not given any undivided interests in the realty which was purchased. They were given only the right to receive "moneys remaining in the Operator's hands" after paying all costs, obligations, and expenses; they were given the right only to have returned to them, at the same time, in equal amounts, the whole or part of the sum receipted for in each instrument; and no Investor was entitled, "as of right," to any payment or return "before said properties and the proceeds thereof have been converted into cash," and all expenses, debts, charges, and commissions had been fully paid. From the terms of the instruments it must be concluded that the interests of the Investors *338 were limited to rights to receive distribution of the net profits to be derived from the operation and sales of the land; and that their beneficial interests were only personal claims against the Operator; and that the Investors did not have interests in the land itself. See Huron River Syndicate, supra.The nature of interests of the Investors serves to distinguish this case from the Gerstle case where it was held that individuals were joint ventures, and the Circuit Court concluded that they were "equitable owners of the property acquired, and that their beneficial interests were not merely personal claims against the syndicate managers." See Kilgallon v. Commissioner, supra.It appears that petitioners advance the argument here that Clayton Company was a trustee-manager for each Investor. If they do, we must hold in this case, as was held in the Kilgallon case, that "the trustee-manager devise by the persons who were financially interested in the venture, constituted an 'association' which was taxable as a corporation. * * *" There remains for consideration the point of the resemblance of the syndicate in question to the corporate form. Of the five salient *339 characteristics of an association taxable as a corporation which are set forth in Morrissey v. Commissioner, supra, the following are found present here: Title to the properties was taken by the Operator, Clayton Company, for the benefit of the enterprise. The Operator was a corporation, and hence, its life was continuous. It took title to the properties in the name of one of its employees; it had the power to have the title conveyed to any other person, corporation, or concern. Thus there was provision for a successor for the purpose of holding the titles. Management and control were centralized in Clayton Company. The death of the individual participants would not and did not cause any change in the constitution of the venture. Accordingly, the analogy to a corporate form of organization is found here in the terms of the agreements which provide for centralized management and the continuity in existence of the venture "secure from termination or interruption by death of owners of beneficial interests." The ownership of the beneficial interests was evidenced by the fourteen instruments and each instrument was binding on successors, heirs, representatives, and assigns. *340 Transfers of entire interests and arts of interests were actually made by sales and assignments; and upon the deaths of some of the original Investors, their interests passed to their heirs, some of whom are petitioners in this proceeding. These transfers and deaths did not affect the continuity of the enterprise. Respondent contends that although limited liability was not expressly provided for in the agreements, liability was in fact limited to the $50,000 investment which each Investor originally made in the enterprise. Respondent's argument has much merit, and the provisions of the instruments are such that it is difficult to understand how the Investors could incur any liability to third parties dealing with the Operator, Clayton Company. However, absence of this single feature is "insufficient to remove the taxpayer from the corporate class." Jordan Creek Placers, 43 B.T.A. 131, 135; Huron River Syndicate, supra; Del Mar Addition, 40 B.T.A. 833; Bert v. Helvering, 92 Fed. (2d) 491. We find that the major and important features set out in Morrissey v. Commissioner, supra, are present here, and conclude that the *341 resemblance of the syndicate to the corporate form is sufficiently substantial to warrant its taxation as a corporation. It is held that the petitioners representing Bloomfield Syndicate are an association taxable as a corporation. Respondent's determination is sustained. Decision will be entered for the respondent.